# HUTCHISON VAPOR HEATING CORPORATION *v.* MOUAT.

PATENTS; NOVELTY; INFRINGEMENT.

1. A new result in a new way is accomplished by a pressure-regulating device capable of maintaining substantially constant pressure and temperature of the heating fluid used in a low-pressure heating system, by means of a movable draft control receptacle operated by water forced into it from a water trap, where the prior art discloses only devices for the regulation of the pressure of high-pressure heating systems by means of regulators operated by steam, or by water directly from the boiler itself.

2. A device regulating the pressure of low-pressure heating systems by means of a movable draft control receptacle operated by water forced into it from a water trap by a sloping steam-pipe connection with the steam space of the boiler, which pipe is stated in the claims in the application for a patent to be "arranged to drain toward said receptacle," is infringed by a similar device employing a horizontal steam pipe to make the connection between the boiler and the water trap, where such a connection is indispensable to the success of the device, and a pipe making it, though horizontal, would drain toward the receptacle, and could be said to be arranged to do so within the meaning of the words quoted from the claim.

No. 3156.   Submitted December 6, 1918.   Decided March 3, 1919.

HEARING on an appeal by the defendants from a decree in the Supreme Court of the District of Columbia, sitting as an equity court, in an infringement suit.          *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a decree in the supreme court of the District sustaining the validity of claims 7 and 10 of appellee's, Thomas G. Mouat, patent (No. 937,686, granted October 19, 1909), holding these claims to be infringed by appellants, Hutchison Vapor Heating Corporation and George H. Zellers, Trading as Zellers & Company, and ordering an injunction and accounting.

The patent embraces a pressure-regulating device capable of maintaining substantially constant pressure and temperature of the heating fluid used in a low-pressure heating system. In the ordinary heating system, which constitutes the prior art in this case, the pressure varies from 5 to 10 pounds and runs as high as 20 or 25 pounds. This is called the high-pressure system. About the time Mouat, the appellee, entered the field, the low-pressure or vapor-heating system came into use. In this system, while the water is evaporated and conveyed in the form of steam to the radiators, it is carried at a pressure of only 2 to 7 or 8 ounces, instead of from 5 to 25 pounds, as in the high-pressure system. In the high-pressure system, the control of the fuel supply very easily may be effected by the ordinary pressure regulator, such as a diaphragm valve, in which the movable part of the diaphragm is raised or lowered as the pressure of the steam rises or falls. There is sufficient fluctuation in this system to insure the success of such a regulator. For example, if a normal pressure of 5 pounds is to be carried in the system, a variation of 20 per cent or 1 pound, either above or below the normal, will operate the diaphragm. It is obvious, however, that in a vapor-heating system, where the pressure varies from 2 ounces to not more than 7 or 8 ounces and the fluctuations are correspondingly small, the high-pressure regulator would be inoperative. Mouat's device was intended to solve that problem by supplying a sensitive apparatus in which the level of the water in the boiler could be disregarded. The following diagram shows the essential features of the Mouat apparatus:

We now reproduce the claims involved:

"7. The combination with a boiler and means for heating the same, of means for maintaining substantially constant the pressure of steam generated thereby, said means comprising a receptacle, a pipe connecting said receptacle with the water space in the boiler, and extending above the bottom of said receptacle, a pipe connecting the upper portion of said recep-

tacle with the steam space of the boiler and arranged to drain
toward said receptacle, a movable supported receptacle com-
municating with the former receptacle, and connections be-
tween said receptacle and the means for heating said boiler."

"10. The combination, with a boiler and means for heating
the same, of means for maintaining substantially constant the
pressure of steam generated by said boiler, said means com-
prising a receptacle extending above the water line of the boiler,
a pipe connecting said receptacle with the boiler and extending
above the bottom of said receptacle, a pipe connecting said
receptacle with the steam space of the boiler and arranged to
drain toward said receptacle, a movably supported receptacle
communicating with the former receptacle and arranged to
drain into the former receptacle, and connections between the
latter receptacle and the means for heating the boiler."

It will be noted that these are combination claims and the
elements of the combination easily may be identified in the
diagram. Thus, "1" is the steam boiler, "6" the receptacle,
"9" the pipe connecting said receptacle with the water space in
the boiler and extending above the bottom of said receptacle.
Pipe "11" connects the upper portion of the receptacle "6"
with the steam space of the boiler. "21" is the "movably sup-
ported receptacle communicating with the former receptacle,"
or "6." It is essential to have a normal or fixed water level
in receptacle "6," regardless of the water level in the boiler.
This is accomplished by having pipe "9" enter receptacle "6"
above the bottom of that receptacle and also above the normal
water level in the boiler, the result being that when the water
in receptacle "6" reaches the level of pipe "9" it falls out by
gravity into the boiler. Any variation in the water level of the
boiler cannot affect the level in receptacle "6," because there
is the same pressure on the surface of the water in that recep-
tacle, exerted through pipe "11," as there is on the surface of
the water in the boiler. Therefore, when steam has been gen-
erated in the boiler, whatever pressure is exerted must be com-
municated to receptacle "6," in the manner described, and that
pressure will force an amount of water through pipe "34" into

movable receptacle "21" and thereby regulate the draft appliance or damper "2."

Steam necessarily is condensing in pipe "11," and the water of condensation is forced or dropped into receptacle "6," so that a constant level is maintained in that receptacle.

Appellants' apparatus is illustrated by the following diagram:

It readily will be seen that there is very little difference between the two devices. The top portion of appellants' pipe "11" is horizontal, and it is contended that the pipe drains largely through receptacle "6" and into pipe "9." In appellants' device the water of condensation from the radiators passes through receptacle "6."

*Mr. Charles L. Sturtevant* and *Mr. Eugene G. Mason* for the appellants.

*Mr. Chas. E. Brock* and *Mr. Harold E. Smith* for the appellee.

Mr. Justice Robb delivered the opinion of the Court:

The validity of the claims involved is not challenged, the defense being noninfringement "when these claims are read in accordance with the exact meaning of the language embodied therein." Specifically, appellants contend that the words in the claims, "and arranged to drain toward said receptacle," are words of limitation. This contention is based upon the theory that the prior art discloses practically all that the Mouat patent shows. This theory we cannot accept. The patent most relied upon is that to Roy, No. 714,942, dated September 5, 1899. That patent appellants' expert admitted "is one that is obviously intended to be used with a system of heating wherein there is considerable steam pressure." Roy uses a diaphragm, and his system differs in several material respects from Mouat's. His damper regulator primarily depends upon the control of the admission of live steam to his movable receptacle. A different problem confronted him and he solved it in a different way. As to the Shurtleff patent (No. 781,467, dated January 31, 1905), appellants' expert admits that water is forced directly from the boiler itself into the bulb used by Shurtleff. Without further analysis of the patent of the prior art we conclude that Mouat has accomplished a new result in a new way. He has worked out the idea of maintain-

ing a substantially constant pressure within a boiler through the medium of a water trap in which the water is kept at a constant level through condensation. And Mouat also is the first to employ a movable draft control receptacle which is operated by water forced into it from the water trap by the steam-pipe connection with the steam space of the boiler.

It is evident, therefore, that pipe "11" performs a double function. Primarily, it permits the same pressure to be exerted on the surface of the water in trap "6" as there is upon the surface of the water in the boiler,—and it is through this pressure that the movable damper receptacle is made to operate. Pipe "11" also is made to serve the secondary purpose of keeping trap "6" supplied with water through condensation. Once having conceived the idea that these two purposes might be combined in pipe "11," it would be a comparatively simple matter so to vary the construction of that pipe as to effect the objects desired. In other words, had it been found that there was not sufficient condensation, pipe "11" could have been made a little larger or the vertical portion a little longer. Appellants' expert admitted this, saying that should pipe "11" prove inadequate it might be extended "so as to furnish an ample condensing surface." Moreover, the steam pressure being toward and not away from receptacle "6," it is apparent that even though the upper portion of pipe "11" should be horizontal the apparatus still would be operative.

But, even disregarding what is common knowledge and indulging in the extremely technical interpretation insisted upon by appellants, pipe "11" still would be "arranged to drain toward said receptacle," even though its upper section should be horizontal, because a substantial portion of it is vertical and the vertical section is connected with receptacle "6." We are fully convinced, however, that the words just quoted should be given such an interpretation as will adequately protect this patentee. In using them he merely was describing a particular construction, or, as he says in his specification, "one exemplification." Having in mind the scope of his invention, the double function of pipe "11," and the end to be attained, we are

clearly of opinion that appellants have taken an altogether too technical view of these claims. And there is authority for this view. *Winans* v. *Denmead,* 15 How. 330, 14 L. ed. 717; *Keystone Bridge Co.* v. *Phœnix Iron Co.* 95 U. S. 274, 24 L. ed. 344; *Hoyt* v. *Horne,* 145 U. S. 302, 36 L. ed. 713, 12 Sup. Ct. Rep. 922; *Metallic Extraction Co.* v. *Brown,* 43 C. C. A. 568, 104 Fed. 345; *Adam* v. *Folger,* 56 C. C. A. 540, 120 Fed. 260; *W. W. Sly Mfg. Co.* v. *Russell & Co.* 110 C. C. A. 625, 189 Fed. 61.

Mention is made in appellant's brief of the file wrapper, but that paper was not made a part of the record by exhibit or otherwise, nor is to be found in the files of the case. However, appellee answering says that claim "7" of the patent in suit originally was claim "12" of the application as filed.

It is of no consequence that appellants have conducted the returning water from the radiators through the water-trap receiver, because they have not eliminated and could not eliminate pipe "11." In other words, appellants have appropriated the essential elements of the Mouat combination; and it is immaterial, in our view, whether they have added an element not necessary to the operativeness of the combination. Whether much or little water in appellants' construction drops into receptacle "6" is not important in view of the admitted fact that pipe "11" is indispensable to the success of appellants' apparatus and is capable of performing the same functions performed in the Mouat apparatus. There may be a distinction, but there is no essential difference in the two combinations, and to refuse protection to this patentee would be entirely to ignore the purpose of the patent laws.

The decree is affirmed, with costs.                *Affirmed.*